OAK PARK NATIONAL BANK, a National Banking Association, *et al.*, Plaintiffs-Appellees, *v.* THE CITY OF CHICAGO, Defendant-Appellant.

(No. 55176;

First District (1st Division)—February 20, 1973.

Richard L. Curry, Corporation Counsel, of Chicago, (William R. Quinlan and Marsile J. Hughes, Assistant Corporation Counsel, of counsel,) for appellant.

Maurice J. Nathanson and Ernest G. Lambesis, both of Chicago, (Ronald S. Cope, of counsel,) for appellees.

Mr. JUSTICE GOLDBERG delivered the opinion of the court:

In this declaratory judgment proceeding, the trial court invalidated a zoning ordinance of the City of Chicago as regards its application to property owned by Oak Park National Bank, as Trustee, La Salle National Bank, as Successor Trustee, and the beneficiaries of the trust (plaintiffs). The City of Chicago, sole defendant, appeals.

We will first consider contentions raised by the City with reference to proceedings before the master in chancery to whom the cause was referred and then the zoning issue on its merits. This may be one of the last opinions of this court pertaining to practice before masters in chancery because of the abolition of that ancient office in the State of Illinois. (See Ill. Const. 1870, art. VI, sec. 8, effective January 1, 1964 and par. 8 of schedule to said article.) On April 1, 1964, the trial court referred the cause to the late Sydney Wolfe, a master in chancery. On December 1, 1964, the court entered an order reciting that "justice requires" the master to conclude the cause and directing the master to complete the services required of him by the order of reference. (See Ill. Const. 1870, par. 8 of schedule.) The master heard all of the evidence in the case and closed proofs by agreement of the parties on July 14, 1965. The master died on April 6, 1969, without completing his report.

However, the master wrote out in longhand a statement of the case, comprising 15 pages, and a summary and analysis of the evidence consisting of 69 pages. His report was never placed into final form and filed. On July 25, 1969, the executor of the master's estate presented the matter to the court and requested allowance of reasonable compensation to the estate as well as other relief. On August 4, 1969, the court entered an order "on the basis of the agreement of all parties before the court." This order directed Harry L. Rudnick, an attorney at law and surviving law partner of the master, to conclude the master's report and to present the same to the court. In accordance with this order, the report was put in final form by Mr. Rudnick and duly filed. The first 84

pages of this report were typed from the handwritten manuscript of the master. Three additional pages were added by Mr. Rudnick. He certified that he had reviewed the entire record and that he agreed fully with the findings made by the master. He concluded that the zoning ordinance in question was invalid in its application to the property of plaintiffs.

Upon notice duly served by Harry L. Rudnick, the City filed objections to the master's report in which it set forth that the court was without authority to appoint a successor to the master under the then applicable provisions of the judicial article of the Constitution of Illinois, above cited. These objections also pointed out that the master had stated his conclusions only with respect to parcel 2 of the subject property (which will be later described) but that the successor had stated conclusions as to parcel 1 without having seen the witnesses.

The trial court entered its decree March 16, 1970, overruling the objections taken by the City and granting the relief prayed by plaintiffs. In the decree, the court found that the order which designated Harry L. Rudnick to complete the master's report had been entered by agreement of all of the parties. The order of December 1, 1964 directing the original master to complete his services was expressly approved by counsel for the City. The notice sent by Rudnick to all attorneys of record on September 25, 1969 described his appointment by the court for completion of the master's report as being with the agreement and approval of the parties. In addition, said appointment of Rudnick is described in an order entered by the court on January 12, 1970, directing the filing of his report, as being "by agreement of the parties." At no point does the City take issue with the facts regarding existence of this agreement. The decree appealed from fixes and allows fees of the deceased master payable to his estate in the sum of $3500 and fees for services rendered by Rudnick in the amount of $900 with the direction that the total of these fees be assessed one-half, or $2200, against plaintiffs and the remaining half against the City.

The City makes no objection to the amount of the fees but urges strongly that the designation of the successor to the master, Harry L. Rudnick, was unauthorized so that the City has been denied a full hearing and thus denied due process of law. The City contends that the trial court had no authority to appoint a successor to the master with or without agreement of the parties.

■■ The City cites and relies upon three Illinois authorities: *Trzebiatowski v. Jerome*, 24 Ill.2d 24, 179 N.E.2d 622, and *People ex rel. Reiter v. Lupe*, 405 Ill. 66, 89 N.E.2d 824 which in turn cites *People ex rel. Brignall v. Lewe*, 383 Ill. 549, 50 N.E.2d 577. These decisions are not applicable here because the case at bar presents one decisive element which

is absent from all of them. In each and all of these cited cases, one of the parties made an objection to the attempted procedure. Entirely to the contrary, in the case at bar, the appointment of Harry L. Rudnick and the completion and filing by him of the report of the deceased master was all done by agreement of the parties. Under these circumstances, any questions of due process of law or constitutional adequacies have been effectively waived by the City.

■■ Generally speaking, constitutional rights, precisely like other rights, may be waived. (*People v. Orr*, 10 Ill.2d 95, 100, 139 N.E.2d 212, and additional cases therein cited.) In addition, in the case at bar, the originally and properly appointed master heard all of the evidence and prepared virtually all of the report. When the parties agreed that Harry L. Rudnick could complete the report itself, all of them were bound by their agreement. None of them should be heard to enter into such an agreement and then attempt to abandon it after the decision became known.

■■ As counsel for plaintiffs correctly points out, the situation here is no different than where parties agree to present a case to the court upon a stipulation of fact. Even in criminal cases it has frequently been held that "* * * the use of a stipulation to waive necessity of proof is an accepted and established, as well as an essential, method of expediting the trial * * *." See *People v. Morris*, 6 Ill.App.3d 136, 140, 285 N.E.2d 247, and cases therein cited.

■■ Furthermore, and finally, although the findings of a master, approved by the trial court are entitled to due weight on review the master's report is advisory only. After filing of the report, the facts remain open for consideration by the trial court and by the reviewing court. This court will make its own determination as to whether "* * * the decree rendered by the court [was] a proper one under the law and the evidence * * *" without regard to the finding of the master upon any particular question of fact. (See *Babray v. Carlino*, 2 Ill.App.3d 241, 244, 276 N.E.2d 435, leave to appeal denied March 29, 1972.) The record shows no prejudice to the City in this regard. We find this aspect of the City's argument lacking in validity.

We turn now to consideration of the merits of the zoning controversy. In this phase of the matter, the City urges that the decree appealed from unreasonably permits conversion of non-conforming residential buildings to business uses; plaintiffs have failed to overcome the presumptive validity of the zoning ordinance; plaintiffs have not sustained unusual hardship because of the present zoning and the change of the zoning boundaries did not constitute "spot zoning." In response, plaintiffs urge that the rezoning of the subject property by the City was arbitrary and unreason-

able; there is no reasonable basis in public welfare which requires the zoning restriction and resulting loss to the property owners and plaintiffs had the right to rely upon the zoning classification, when they purchased the property, remaining unchanged without a reason based upon public welfare.

The subject property presents an anomalous situation. It is located in the vicinity of the northeast corner of Division and State Streets in Chicago. The corner parcel itself, not part of the subject property, has a frontage of 27 feet on State Street and 102 feet on Division Street and is a regular rectangle. One portion of the subject property (referred to as parcel 1) is immediately to the north of the corner parcel, fronts 40 feet on State Street and extends back to the east for 102 feet. Its street address is 1203-1205 North State Street. At the eastern boundary of this portion of the subject property and of the corner parcel, there is a ten foot vacant strip extending in a north and south direction. The second portion of the subject property (parcel 2) has a frontage of 48 feet on Division Street and extends back to the north for 67 feet. There is an alley immediately to the east of this parcel. It is commonly known as 12-14 East Division Street. Thus it appears that the subject property is in effect similar in shape to the letter "L" in an upside down position resting upon, or completely surrounding, the corner parcel.

Parcel 1 (fronting on State Street) is improved with a basement and four-story building. Parcel 2 is improved with basement and three-story building. All of these improvements on both parcels were erected about 1890. The actual uses upon these parcels will later be described.

The zoning history of the subject property shows that it was zoned for commercial uses under the City ordinance enacted in 1923. This classification was continued by the subsequent ordinance in 1942 which classified both parcels for business uses. Quite similar uses were permitted under both of these classifications. The beneficial owners of the property purchased it in 1946 when it was entirely classified for business uses.

In 1957, the City adopted a comprehensive zoning ordinance which changed the status of the subject property. Parcel 1 (fronting on State Street) was rezoned to residential uses under an R-7 classification. This R-7 zoning was continued to the east across the north 40 feet of parcel 2 and until the alley which forms the east boundary of parcel 2. However, the entire corner parcel fronting 27 feet on State Street and 102 feet on East Division Street was zoned for business purposes under the B4-5 classification. This zoning was continued in an easterly direction to the alley; so that the south 27 feet of parcel 2, fronting on Division Street, is also classified as B4-5. Consequently, parcel 2 is improved with one

structure but the north 40 feet of that parcel is zoned R-7 and the south 27 feet thereof is B4-5.

In 1946, when plaintiffs acquired the subject property, parcel 1 contained business uses and some apartments. It had a shoe repair shop, an art store, a gift shop, a real estate office, a hair removal emporium and also apartments used for living purposes. At that time, on parcel 2, there were two apartments on the first floor, one used for living quarters and the other as a fur shop. There were apartments on the second floor, one of which was devoted to the sale of paintings and objects of art. At present, the actual uses of the subject property are similar to the activities carried on there in 1946. Similarly, present land uses in the immediate area of the subject property hardly differ from the situation as it existed in 1946.

At the present time, the area northeast of the intersection of State and Division Streets is generally zoned R-7 with the exception of the narrow 27 foot strip on the north of Division Street extending west from State Street to the alley, a distance of 150 feet. On the east side of State Street, south of Division, the property is zoned under a B4-5 category.

As regards actual land uses in the vicinity of the subject property when plaintiffs acquired it, on the north side of Division Street, west of State Street, which is directly across from the subject property, a person walking west would pass a restaurant, a rooming house, and then various stores, offices and apartments to Dearborn Street, the first street to the west. On the south side of Division Street, proceeding from the corner diagonally across from the subject property and walking west from State Street, one would encounter a drug store, tavern, beauty shop, tailor shop, restaurant, several establishments euphemistically referred to as cocktail lounges, a dress shop, a gift shop and then a restaurant.

On the east side of State Street, proceeding in a southerly direction from Division Street, there were: a restaurant including a bar, a grocery shop, beauty shop, barber shop and flower store. In the same area on the west side of State Street, south of Division Street, there were: a large drug store, a candy store and an apartment building with doctors' offices on the lower floors. On the west side of State Street going in a northerly direction from Division Street, there were: a restaurant on the corner, then a cocktail lounge, a cleaning shop, a supermarket and then a tall structure known as the Canterbury Hotel. There was a cocktail lounge within this building.

There is testimony that these uses were generally constant in their nature from the time that plaintiffs acquired their property in 1946 until 1957. Some changes were made from that time until the present. A park-

ing lot was installed on the east side of State Street, north of parcel 1. A small tavern was established shortly west of parcel 2 on the north side of Division Street. On the north side of Division Street, west of State Street, a one-story building was erected and was occupied by a dress shop, barber shop and book store.

As regards the subject property itself, it was partly damaged by fire in 1960 and the owners remodeled it. This was virtually a restoration of the building as it previously existed excepting only elimination of basement stores. The corner parcel on the northeast corner of State and Division Streets which, as we have noted, is surrounded on two sides by both parcels of the subject property, is occupied by a large restaurant and also by a small tavern immediately to the east of the restaurant. There are apartment uses immediately above the restaurant.

Plaintiffs do not seek approval from the court of any specific proposed use for the subject property. One of the plaintiffs testified that present zoning restrictions obliged him to reject proposed uses for the property including a theater, cocktail lounge, book publisher, caterer, travel agency and a restaurant with live entertainment. Plaintiffs substantiated this contention with additional evidence. One witness testified that he was interested in leasing the entire second floor of parcel 1 of the subject property for a catering service. Another testified that he would rent the entire first floor of parcel 1 for a launderette operation. The owner of the corner restaurant testified that he would rent the store on the first floor of parcel 1 for a cocktail lounge. When the cause was heard, parcel 1 had two shops occupied on the first floor and all of the upper floors were vacant.

Plaintiffs called as their witness an experienced realtor who handled real estate in the area. He described the land uses in the vicinity. He testified that in his opinion the highest and best use of the entire subject property was within those categories authorized under the City zoning of B4-5. In his opinion, parcel 1 as presently zoned has a value of $65,000 and parcel 2 of $75,000; a total of $140,000. If the entire property were rezoned to B4-5, parcel 1 would have a market value of $115,000 and parcel 2 would be valued at $100,000; a total of $215,000. It was, therefore, his opinion that the existing zoning reduces the market value of the subject property by $75,000.

The City called in opposition a licensed realtor of long experience in the Near North area. After describing the zoning and land uses in the area, he testified that the subject property could best be developed for apartment use. He stated his opinion that "the highest and best use" of parcel 1 was under R-7 zoning. He also testified that some of the uses which had been proposed to plaintiffs by prospective tenants "would

have a deleterious effect on the neighborhood." He further testified that the present uses on the subject property do not have such effect and that other existing uses in the area similarly would not have such effect excepting only one cocktail lounge advertised by an outdoor sign. He did not regard the supermarket on the west side of State Street in the first block north of Division as having a deleterious effect. This witness stated no opinion regarding the market value of the subject property.

The City also called a real estate appraiser, broker and planner who was familiar with the area for many years. He stated the opinion that the highest and best use of parcel 1 would be for a multifamily dwelling containing efficiency and one bedroom apartments on the upper floors with tenant parking on the ground floor. He based this opinion upon the need for such type of apartments in the Near North area because of convenient fast transportation to downtown. He expressed the opinion that combining a retail store with an apartment structure on parcel 1 would adversely affect surrounding property. He expressed the same opinion for the same reasons with reference to parcel 2.

The City also called the Executive Director of a business association operating in the area. Although apparently unqualified in planning or real estate matters, he expressed the opinion that the highest and best use of parcel 1 would be under R-7 or B-2 zoning. In his opinion, parcel 2 should also be devoted to B-2 uses but B-4 uses on parcel 2 would not be as objectionable as the same uses on parcel 1.

■■ In addition, the City called three witnesses who own residential property in the vicinity of the subject property. All three of them reside on Scott Street, which is the next street north of Division, in the first block east of State Street. One of these witnesses resides on the north side of Scott Street and two reside on the south side. All of them were in favor of the present zoning and opposed to any change. Their testimony must be considered in the light of the accepted principle "* * * that the use of property cannot be restricted or limited merely because neighboring property owners so desire, or because they think it might protect the value of their residence." *Regner v. County of McHenry*, 9 Ill.2d 577, 582, 138 N.E.2d 545.

■■ In considering the validity of the zoning restriction, we should commence upon the basis of the well known and widely cited decision of the Supreme Court in *La Salle Nat. Bank v. County of Cook*, 12 Ill.2d 40, 145 N.E.2d 65. In the City's reply brief, an attempt is made to differentiate this decision for factual reasons. This may be partially correct but, as virtually conceded by the City, the basic theories expressed by the Supreme Court in *La Salle Nat. Bank* constitute, and still remain, the accepted principles which should be applied to the decision of vir-

tually every zoning case. As the Supreme Court there expressly recognized, each zoning problem is different and they are all *sui generis* in that the validity of the zoning ordinance must be determined by the individual facts and circumstances of each separate case. (See 12 Ill.2d 40, 46.) This does not mean that the prime elements set forth by the Supreme Court may be disregarded. These principles have been repeatedly stated by the courts of Illinois. See 12 Ill.2d 40 at pages 46, 47; also, *La Salle Nat. Bk. v. City of Chicago*, 4 Ill.App.3d 266, 271, 280 N.E. 2d 739.

■■ It is correct, as the City urges, that every zoning ordinance, including that here involved, is presumptively valid. As held in *La Salle Nat. Bank v. County of Cook*, this presumption of validity may be overcome only by clear and convincing evidence and the burden of proof rests upon plaintiffs. See 12 Ill.2d 40, at page 46.

■■ Proceeding to apply the established basic principles to the evidence at bar, the first determination is concerned with existing uses and zoning of nearby property. The fact here preponderate greatly in favor of the position taken by plaintiffs. The remaining three corners of the intersection of State and Division Streets are devoted to business uses by the existing City ordinance for frontages greater than the corner in question. Furthermore, the first alley, 150 feet east of State Street on the north side of Division Street, is recognized by the City as a natural zoning boundary. Property to the west of the alley is zoned B4-5 and that to the east is zoned R-7. It would seem only logical, therefore, that the B4-5 zoning should be extended north on State Street in order to encompass parcel 1 and the north 40 feet of parcel 2. This would allow business frontage on the east side of State Street north of Division for a total of only 67 feet; less than that permitted on each of the other three corners of the intersection.

■■ It must be remembered that reviewing courts of Illinois have often applied the principle that in determining these zoning questions we must regard "* * * of paramount importance the question of whether the subject property is zoned in conformity with surrounding existing uses and whether those uses are uniform and established." (*Jacobson v. City of Evanston*, 10 Ill.2d 61, 70, 139 N.E.2d 205.) The business and commercial uses upon the subject property were in conformity with actual existing similar uses for many years and so remain to this day. These surrounding uses are uniform and established for many years.

■■ Considering next the extent to which property values are diminished by the existing ordinance, the evidence is completely one-sided. As shown, plaintiffs proved by competent evidence that the subject property would increase in value approximately $75,000 if rezoned to the

B-4 classification. In other words, the present zoning prevents plaintiffs from having a 50% increase in the value of their property and its imposition destroyed the value of their property to the extent of $75,000. However, this factor standing alone is not sufficient. We must pursue the inquiry further and we must consider whether this diminution of the value of plaintiffs' property will promote the health, safety, morals or general welfare of the public. We must also balance the relative gain to the public as compared to the hardship imposed upon plaintiffs by the zoning restriction. *La Salle Nat. Bank v. County of Cook*, 12 Ill.2d 40, 47.

■■ Evaluation of the evidence in the light of these factors leads inevitably to the result that the value of plaintiffs' property has been partly destroyed by existing zoning without any correlative gain to the public health, safety, morals or general welfare. This record shows that since 1923 the entire subject property has been zoned by the City for business or commercial uses. Such uses are prevalent to the extent that they dominate the surrounding area insofar as frontage upon both State and Division Streets is concerned. The City recognized this in enactment of the zoning ordinance in 1923 and reaffirmed the wisdom of this classification by enactment of the subsequent ordinance in 1942. There is no evidence of any change in the surrounding area or any change in actual land uses in the vicinity of the State-Division intersection which can be used as a justifiable basis for the zoning change of the subject property instituted by the comprehensive ordinance of 1957.

The record is clear that uses in the area did not change substantially from 1946, when plaintiffs acquired their property, until 1957 when the zoning ordinance was changed. Additional uses in the area during the 11 year period conformed to the general character of the intersecting streets in this vicinity which was business or commercial.

■■ One of the City's chief arguments is based upon residential uses in the area. It is correct that there are residential uses along the north and south sides of Scott Street and also on the west side of Astor Street. However, these established residential uses have no relevancy in consideration of the type of use which should be permitted virtually at the northeast corner of State and Division Streets. As shown, parcel 1 has a frontage of only 40 feet on State Street and it is immediately north of the corner parcel which has a frontage of only 27 feet on the same street. The entire subject property takes its character from established intersectional business uses upon all four corners of State and Division Streets; not from any residential uses in the general area. See *Petropoulos v. City of Chicago*, 5 Ill.2d 270, 125 N.E.2d 522.

■■ The City seeks also to analyze the case at bar as though plaintiffs were attempting the conversion of nonconforming residential buildings

to business uses. In this regard, the City relies strongly upon *Mercer Lumber Co. v. Vil. of Glencoe,* 390 Ill. 138, 60 N.E.2d 913. However, that case has no factual relevancy here. It is concerned only with a question of expansion of a nonconforming use. In fact, *Mercer* has been cited in subsequent decisions in connection with that very question of the attempted expansion of a nonconforming use. (See *People v. City of Highland Park,* 122 Ill.App.2d 117, 257 N.E.2d 798, and *Kelley-Williamson Co. v. City of Rockford,* 61 Ill.App.2d 482, 487, 209 N.E.2d 681.) The case at bar involves no such question. The property of plaintiffs had a commercial or business classification for 11 years after plaintiffs acquired it. It was only the intervention of the 1957 zoning ordinance which so radically changed the classification of all of parcel 1 and one-half of parcel 2 that the uses in question became classified as nonconforming uses. Plaintiffs seek here to invalidate that classification in its entirety.

Consideration of the suitability of the purpose for which the subject property is presently zoned and the length of time that it has remained vacant, in connection with land development in the vicinity, *La Salle Nat. Bank v. County of Cook,* 12 Ill.2d 40 at page 47, leads us to the same result. It is correct that plaintiffs encountered difficulty at one time in renting their property or portions of the subject property for business or commercial uses. However, the uncontradicted evidence adduced by plaintiffs shows good possibility of putting the property to productive economic use were it not for the present zoning restriction. The only evidence in the record regarding possible development of parcel 1 and part of parcel 2 for apartment or residential use is an assertion of opinion regarding the possibility of building an apartment dwelling consisting of efficiencies and one bedroom apartments combined with garage space on the first floor. No evidence was offered regarding the economic feasibility of this type of proposed development.

■■ In the case at bar, we cannot help but conclude that the present zoning ordinance causes a substantial decrease in the value of the property owned by plaintiffs without any accompanying benefit to the public welfare. On the contrary, it would appear that public welfare would far better be served by devotion of the subject property to business or commercial uses than it would by the intrusion into this immediate area of potentially low grade housing consisting of efficiency and one bedroom apartments combined with garage facilities on the ground floor. "The law does not require that the subject property be totally unsuitable for the purpose classified but it is sufficient that a substantial decrease in value results from a classification bearing no substantial relation to the public welfare." (*La Salle Nat. Bank v. County of Cook,* 12 Ill.2d 40, 48, 145 N.E.2d 65.) This test also has frequently been applied by reviewing

courts of Illinois. *La Salle Nat. Bk. v. Vil. of Harwood Heights,* 2 Ill.App. 3d 1040, 1047, 278 N.E.2d 114.

■■ In addition, there is one factor of crucial importance which requires us to affirm the decree. After plaintiffs invested their money and purchased their property, the zoning classification remained unaltered for 11 years. Plaintiffs had a right to rely upon the zoning classification then in effect and to assume that it would "* * * not be changed except for the public good." (*Langguth v. Village of Mount Prospect,* 5 Ill.2d 49, 52, 124 N.E.2d 879.) The Supreme Court of Illinois has used even stronger language in establishing the right of every property owner to rely upon the rule of law that the zoning classification of his property will only be changed if required for the public good. The Supreme Court has referred to this principle as "* * * both a liberty and a property right." *Northern Tr. Co. v. City of Chicago,* 4 Ill.2d 432, 437, 123 N.E.2d 330.

In the case at bar, one of the beneficial owners testified that he was aware of and relied upon the business zoning classification when he purchased the property. The City now is desirous of changing this classification by an ordinance which in effect cuts a portion of plaintiffs' property in half without, at the same time, achieving any improvement in the public good or welfare. In fact, quite to the contrary, the evidence would indicate that the present zoning classification of the subject property might well result in detriment to the immediate area.

Conversely, it appears that the change in zoning classification sought by plaintiffs would have no detrimental effect upon the public welfare. Although defendant offered evidence to the contrary, analysis shows that the testimony of defendant's witnesses has elements of inconsistency each with the other. The realtor who testified for the City expressed the opinion that certain of the uses tendered to plaintiffs by prospective tenants would have a bad effect upon the neighborhood. However, he did not think that a public parking lot, a dry cleaning establishment or a grocery store had any deleterious effect. He also testified that present commercial uses in the subject property have not affected the neighborhood.

The planner who testified for the City was in favor of efficiency apartments and a parking garage for one portion of the subject property and expressed the opinion that this would not have any deleterious effect. This witness also felt that certain proposed uses would "lower the prestige of the neighborhood." Yet, contrary to the opinion of the preceding expert, he did not feel that outside signs in the immediate area advertising a restaurant and a saloon would have any such effect.

The business association director called by defendant would be op-

posed to any tavern or restaurant on the subject property on the ground that it would have an adverse effect to the area. This is in conflict with the testimony of the first two witnesses who took the position that taverns and restaurants, even in one case with outside signs, would have no adverse effect. Also, this last witness would approve a B-2 zoning classification for parcel 1 and stated that even a B-4 use on parcel 2 would not be as objectionable as B-4 uses on parcel 1. In view of this evidence, the conclusion is well justified that B-4 uses upon the entire subject property would have no adverse effect upon the surrounding area.

■■ The City urges that plaintiffs should have presented a proposed use of the subject property for consideration by the trial court. In our opinion, there is no such mandatory requirement in zoning cases. The trial court had authority to approve a proposed specific use but it was not compelled to do so. *Sinclair Pipe Line v. Richton Park,* 19 Ill.2d 370, 167 N.E.2d 406.

■■ The wisdom of this conclusion is made evident by the facts in the case at bar. Were it not for the imposition of the 1957 zoning ordinance upon their property, plaintiffs apparently would have had no difficulty in obtaining tenants for various uses. However, because of the ordinance, plaintiffs could not have entered into a binding lease for any of these proposed uses. In addition, plaintiffs' complaint was filed August 20, 1963 and this litigation still continues. This illustrates forcefully the impossibility of entering into any lease for any of the available uses subject to completion of zoning litigation. In addition, in October of 1962, plaintiffs themselves filed with the City Council a proposed amendment which would have changed the zoning of the entire subject property to B4-5. This proposed amendment had been approved by the Commissioner of City Planning, by the City Zoning Administrator and by a Committee of the Chicago City Council. The Council itself permitted more than six months to elapse without action on the proposed amendment; thus compelling plaintiffs to institute the within litigation.

Two additional comments are necessary. Plaintiffs urge that the master's report as filed recommended invalidation of the ordinance on the ground that the R-7 classification of plaintiffs' property constituted spot zoning. We find it unnecessary for us to rule upon this completely theoretical issue. Its determination would have no effect upon the merits of the situation as above set forth.

■■ The final contention of the City is an argument of variance. The complaint alleged that plaintiff, Ernest G. Lambesis, was the beneficial owner of the property. The proof showed that the equitable owners of the property are the original plaintiff and his wife, Tasia E. Lambesis. After this court heard oral argument, the original plaintiff filed a motion

to amend the proceedings by making Tasia E. Lambesis an additional party plaintiff. Over objection by the City, we have granted this motion. See Supreme Court Rule 366(a)(2), 50 Ill.2d Rule 366(a)(2).

Upon full consideration we find no reversible error in this record. The decree appealed from is accordingly affirmed.

Decree affirmed.

BURKE, P. J., and EGAN, J., concur.